# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARREN HUGH GREER,<br><br>Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL[1],<br>Acting Commissioner of Social Security,<br><br>Defendant. | Case No.: 1:16-cv-0042 - JLT<br><br>ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND REMANDING THE ACTION PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g)<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF DARREN HUGH GREER AND AGAINST DEFENDANT NANCY BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY |

Darren Hugh Greer asserts he is entitled to a period of disability and disability insurance benefits under Title II of the Social Security Act. Plaintiff argues the administrative law judge erred in evaluating the record and seeks judicial review of the decision to deny his applications for benefits. Because the ALJ erred in evaluating the medical record, Plaintiff's motion for summary judgment is **GRANTED** and the matter is **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## **PROCEDURAL HISTORY**

On December 16, 2011, Plaintiff filed an application for benefits, alleging disability beginning January 18, 2008. (Doc. 18-3 at 27) His application "was denied initially on July 9, 2012, and upon

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court substitutes Nancy A. Berryhill for her predecessor, Carolyn W. Colvin, as the defendant.

1

reconsideration on February 6, 2013." (*Id.*) Plaintiff requested a hearing, and testified before an ALJ on September 20, 2013. (*Id.*) The ALJ concluded Plaintiff was not disabled, and issued an order denying benefits on January 25, 2014. (*Id.* at 27-37) The Appeals council denied Plaintiff's request for review of the decision on March 19, 2015. (*Id.* at 10-14) Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security ("Commissioner").

## **STANDARD OF REVIEW**

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## **DISABILITY BENEFITS**

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v.*

*Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity ("RFC") to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

**A.  Relevant Medical Evidence**

On January 19, 2009, Plaintiff stumbled while working at a construction site, "tripping over and falling on his right knee and twisting the left side of his back." (Doc. 18-8 at 13) Plaintiff said he "waited for some five minutes before he could get up, rest and be able to go on with his working activities for the rest of the afternoon shift, but he noted that he was experiencing increased discomfort to the right knee and lower back." (*Id.*)

Plaintiff reported the fall to a supervisor the next day, and "he was sent to US Health Works for assessment and management" with Dr. David Rollins. (Doc. 18-8 at 13; Doc. 18-12 at 5) Dr. Rollins observed Plaintiff walked with an abnormal gait and had swelling in his right knee. (Doc. 18-12 at 5) Dr. Rollins diagnosed Plaintiff with a contusion on his knee, open wound on the right tibia, right knee sprain, and lumbar strain. (*Id.* at 2, 6) Dr. Rollins referred Plaintiff to physical therapy, to receive sessions three times a week for two weeks. (*Id.* at 6) In addition, he indicated Plaintiff could return to work with modified duties, including no kneeling and squatting, and a limit of lifting, pulling, and pushing 25 pounds. (*Id.* at 2)

At a check-up the following week, Dr. Rollins opined Plaintiff had "improved, but slower than expected." (Doc. 18-11 at 77) He noted Plaintiff's referral for physical therapy was still pending. (*Id.*)

Dr. Rollins again opined Plaintiff could return to work with the modified duties. (*Id.* at 76)

Plaintiff started physical therapy at the end of January 2009 and reported he had pain in his right hip while doing the exercises. (Doc. 18-11 at 73) In early February, Plaintiff reported that he had pain in his right leg. (*Id.* at 63) Plaintiff reported that his pain was "worse [when] laying down" and he had "minimal improvement" with the physical therapy sessions. (*Id.* at 66, 68) Angelica Buenrostro, P.A., observed that Plaintiff had an abnormal posture and tenderness on his thoracolumbar spine. (*Id.* at 68) Further, she found Plaintiff had a restricted range of motion of his back and flexion of the knee. (*Id.*) Plaintiff was directed to continue with physical therapy, and was released to work with kneeling, squatting, lifting, pushing, and pulling restrictions. (*Id.* at 59, 66)

In March 2009, Plaintiff continued to report "persistent pain" and Dr. Rollins noted that Plaintiff limped and got on and off the examination "stiffly." (Doc. 18-11 at 60, 42) Dr. Rollins opined that while Plaintiff "had some initial improvement," his pain became "unresponsive to treatment," which included "several different anti-inflammatory medications as well as a course of physical therapy." (*Id.* at 42) Upon the request of Dr. Rollins, Plaintiff had images taken on his lumbar spine and right knee. (*Id.* at 60, Doc. 18-8 at 20-22) Dr. Douglas Tait determined Plaintiff had a "[l]eft paracentral to posterolateral disc protrusion measuring up to 5 mm at L5-S1 causing moderate narrowing of the left neural foramen and abuts the nerve root but does not appear to compress the nerve root." (Doc. 18-8 at 20) Dr. Tait also found "[m]inimal disc bulging at L3-4, L4-5 and on the right at L5-S1" and "minimal anterior disc and osteophytes from T11 to L5." (*Id.*) With the images of Plaintiff's knee, Dr. Tait found a "[f]ull thickness tear in the posterior horn of the medial meniscus," "strain of the anterior cruciate ligament," and "[m]inimal joint effusion with a moderate-sized Baker's cyst." (*Id.* at 22)

Dr. Danilo Martinez examined Plaintiff's back upon the request of Dr. Rollins on April 27, 2009. (Doc. 18-8 at 13) Dr. Martinez found Plaintiff had "some discomfort and pain with range of motion, especially flexion at 70 degrees," where Plaintiff "experience[d] pain over the left flank and left buttock, and with rotation or tilting to the left side." (*Id.* at 15) Plaintiff had positive straight leg raise tests at 8 degrees on the right and 65 degrees on the left. (*Id.*) In addition, Dr. Martinez reviewed the MRI taken on March 28, 2009 and opined the image showed "dehydration phenomenon of all the

lumbar discs, but adequate preservation of the height." (*Id.*) Dr. Martinez diagnosed Plaintiff with an acute lumbar strain, left lumbar radiculopathy, multilevel degenerative disc disease, and left foraminal disc protrusion at L5-S1. (*Id.*) He concluded Plaintiff "may benefit from a lumbar epidural block." (*Id.* at 16)

Dr. Gary Watson performed a "[r]ight knee arthroscopy, with partial medial and partial lateral meniscectomy" on June 8, 2009. (Doc. 18-8 at 47) Dr. Watson observed during the procedure that Plaintiff had "a complex tear of the posterior horn of the medial meniscus, as well as mild to moderate degenerative change of the articular cartilage of the medial femoral condyle and medial tibial plateau." (*Id.* at 48)

On July 31, 2009, Dr. J. Kenneth Fluence administered a lumbar epidural steroid injection. (Doc. 18-8 at 42) Plaintiff reported he had "excellent relief for 4 [weeks] with less meds [and] improved tolerance of [activities of daily living]." (Doc. 18-11 at 7) However, after the effects wore off, Plaintiff reported his pain was "gradually worsening." (*Id.*) Plaintiff had another epidural injection in his lumbar spine on December 28, 2009. (Doc. 18-8 at 37-38) Dr. Fluence noted Plaintiff had "been treated with oral medication, physical therapy, etc[.] with very poor results." (*Id.* at 37)

In February 2010, Plaintiff told Dr. Martinez that "walking [had] become more difficult due to increased lower back strain." (Doc. 18-8 at 11) Plaintiff reported he could not "walk more than 45-60 minutes without significant pain that he quantifie[d] between 6-8 on an analog visual pain scale of 0-10." (*Id.*) He described having "lower back pain radiating to the posterior aspect of the left lower limb to the calf, paresthesias involving the outer aspect of the lower leg and outer aspect of the left foot." (*Id.*) Dr. Martinez observed that Plaintiff walked with a limp favoring the left, and his straight leg raise was positive at 60 degrees on the left and 80 on the right. (*Id.* at 12) Dr. Martinez noted Plaintiff's two epidural blocks "failed to give him significant relief" and a range of motion in the lumbar spine produced pain for Plaintiff. (*Id.*) Dr. Martinez recommended Plaintiff receive "a left L5-S1 transforaminal epidural block." (*Id.*)

Due to Plaintiff's complaints of "progressively worse pain in the back," the plaintiff underwent another MRI of his lumbar spine on March 4, 2010. (Doc. 18-8 at 18-19) Dr. Tait compared the results with the prior MRI and noted the "[d]egenerative changes in the facet joints [were] the same except for

L5-S1 which [had] become more severe." (*Id.* at 19) Dr. Tait also found "[m]inimal disc bulging at L3-4 and L4-5;" "minimal narrowing of the spinal canal at L3-4, L4-5 and L5-S1;" and "[m]inimal neural foraminal encroachment at L3-4 and L4-5, mild left minimal right at L5-S1." (*Id.* at 18-19)

Dr. Ronald Wolfson performed an orthopedic qualified medical evaluation on April 12, 2010. (Doc. 18-14 at 93) Plaintiff reported his "major problem [was] his low back pain and the radiation down the left leg." (*Id.* at 95) He told Dr. Wolfson that he was trying to strengthen his right knee by walking at least one mile a day, but it was difficult due to the pain in his left leg. (*Id.*) Dr. Wolfson found Plaintiff had "flattening of the lumbar curve" and exhibited "tenderness in the left gluteal area and in his left thigh." (*Id.* at 99) In addition, Plaintiff had "positive straight leg raising on the left," and his motor strength was reduced on the left side. (*Id.* at 99-100) Dr. Wolfson recommended that Plaintiff participate in "a work hardening program" because he did "very heavy work" and was "severely weakened by the injury." (*Id.* at 101) Further, Dr. Wolfson believed Plaintiff should receive "a transforaminal block for his left back at the L5-S1 level." (*Id.*) Dr. Wolfson opined Plaintiff "need[ed] to remain on temporary disability." (*Id.*)

Plaintiff had a "[l]eft L5-S1 foraminal block under fluoroscopy and sedation" administered by Dr. Martinez on May 4, 2010. (Doc. 18-8 at 21) At a follow-up appointment with Dr. Martinez on May 13, Plaintiff reported "fairly good results," indicating his "level of pain…decreased by 40-50%" and he was not taking pain medication. (*Id.*) Dr. Martinez observed that Plaintiff was "able to sit… fairly well," his gait was normal, and his straight leg raise with the left leg increased to 70 degrees. (*Id.*) Dr. Martinez concluded Plaintiff "responded well to the foraminal block," and indicated another could be given in six to eight weeks. (*Id.* at 9)

On June 24, 2010, Dr. Martinez administered to Plaintiff another epidural injection. (Doc. 18-8 at 19) At a follow-up appointment the next week, Plaintiff told Dr. Martinez that he did not have the same benefits as his prior treatment, and he was "experiencing persistent left lower limb pain radiating through the posterior aspect of the thigh and calf, and especially his heel." (*Id.*) Plaintiff reported he was taking both Norco and Soma each day, and reported his pain was a constant "7" on a scale of 0 to 10. (*Id.*) Dr. Martinez found no muscle spasms or tenderness in the lumbar spine but range of motion caused Plaintiff pain and discomfort. (*Id.*)

In July 2010, Plaintiff reported that he "injured his left knee when his right knee gave way." (Doc. 18-8 at 28) A few months later, on September 16, 2010, Plaintiff had "advanced x-rays" taken of his left knee. (Doc. 18-8 at 26) Dr. Watson determined that the images showed "mild degenerative changes and slight narrowing of the lateral joint space." (*Id.*)

In March 2011, Plaintiff had an MRI taken of his left knee. (Doc. 18-8 at 27; Doc. 18-12 at 13) Dr. Watson observed that the MRI "showed a vertical tear of the posterior horn of the medial meniscus and a probable oblique tear of the posterior horn of the medial meniscus, extending to the undersurface." (Doc. 18-8 at 27) Dr. Tait also found "[m]ild joint effusion" and "[b]ony edema in the anterior medial tibial plateau. " (Doc. 18-12 at 13)

Plaintiff underwent an MRI on his right knee on October 28, 2011. (Doc. 18-12 at 33-34) Dr. Ajit Nijjar found Plaintiff had "some subchondral bony cystic changes;" "[m]oderate degenerative arthritic changes in the medial joint compartment with chondromalacia and bony osteophyte formation;" and "some central blunting of the body and posterior horn of the medial meniscus and the posterior horn is rather diminutive, likely representing a previous macerated meniscal tear." (*Id.* at 33)

On November 28, 2011, Dr. Watson performed a "[l]eft knee arthroscopy and partial medial meniscectomy." (Doc. 18-8 at 27) Following the surgery, Plaintiff "had 10 visits of physical therapy." (Doc. 18-14 at 82) Although Dr. Watson believed Plaintiff would benefit from additional sessions, they were not authorized. (*Id.*) Plaintiff continued to see Dr. Watson on a monthly basis and receive medication from him. (*Id.*)

In March 2012, Plaintiff had an MRI taken of his lumbar spine. (Doc. 18-14 at 40-41) Dr. Serge Djukic opined that at the L4-5 level, Plaintiff had facet arthropathy and at the L5-S1 level, there was "a left eccentric broad based protrusion … with a focal central annular fissure," facet hypertrophy, and "mild to moderate …lateral recess stenosis." (Doc. 18-14 at 41)

In April 2012, Plaintiff told Dr. David Bybee that he continued to have pain in his knees and low back, which he "described as sharp, aching and throbbing." (Doc. 18-14 at 38) Plaintiff said his lower back pain was an "8/10" pain was "exacerbated by all activity," but "relieved by opioid analgesics." (*Id.*) Dr. Bybee observed that Plaintiff's "pain limited heel walking on the left and toe walking." (*Id.*) Dr. Bybee found Plaintiff's strength was "5/5 [in] all muscle groups [for] both lower

extremities." (*Id.*)

Dr. Dale Van Kirk performed "a comprehensive orthopedics evaluation" on May 23, 2012. (Doc. 18-14 at 44) Plaintiff reported that the injections in his back "did help to some degree," yet he continued to have pain in his back and knees. (*Id.* at 44-45) He said the pain "increase[d] if he [had] to lift heavy objects, twist, turn, climb, run, jump, squat, go up and down ladders or go up and down stairs frequently, crouch or crawl." (*Id.* at 45) He estimated that he could "stand and walk for about 45 minutes," sitting was "limited to about one hour." (*Id.*) Dr. Van Kirk observed that Plaintiff sat "comfortably in the examination chair," walked around the room, and got on and off the examination table without difficulty. (*Id.* at 46) Plaintiff had a "[f]ull range of motion" in both knees, but exhibited "slight pain" in the left knee and was unable to fully squat due to pain. (*Id.* at 46-47) He found Plaintiff's strength was "5/5" in all extremities and opined he was "a very strong man." (*Id.* at 47, 48) Dr. Van Kirk opined Plaintiff "should be able to stand and/or walk cumulatively for six hours out of an eight-hour day," and had no limitations with sitting. (*Id.* at 48) In addition, he believed Plaintiff "should be able to lift and carry frequently 25 pounds and occasionally 50 pounds." (*Id.*) Dr. Van Kirk concluded Plaintiff was "limited to only occasional postural activities, including bending, stooping, crouching, climbing, kneeling, balancing, crawling, pushing or pulling." (*Id.*) Finally, Dr. Van Kirk opined Plaintiff "should not be required to work in an extremely cold and/or damp environment." (*Id.*)

On June 12, 2012, Dr. Nasrabadi reviewed the medical record related to Plaintiff's physical impairments. (Doc. 18-14 at 11-13) Dr. Nasrabadi opined Plaintiff was able to lift and carry 10 pounds frequently and 20 pounds occasionally; stand and walk about six hours in an eight-hour day; and sit about six hours in an eight-hour day. (*Id.* at 11) According to Dr. Nasrabadi, Plaintiff had an unlimited ability to push and pull; could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; and frequently balance. (*Id.* at 11-12) Dr. Nasrabadi opined Plaintiff could never climb ladders, ropes or scaffolds; and should avoid concentrated exposure to extreme cold and wetness. (*Id.* at 12)

Dr. Wolfson performed another qualified medical evaluation on September 20, 2012. (Doc. 18-14 at 81) Dr. Wolfson found Plaintiff's "symptomology of the left knee [had] resolved somewhat," because there was no swelling or heat. (*Id.* at 83) Plaintiff had "a positive straight leg raise on the left," and his flexion range of motion was reduced to 30 degrees, while normal was 60 degrees. (*Id.*)

Further, Dr. Wolfson found Plaintiff had "poor intersegmental motion and poor reversibility of the curve" in his spine. (*Id.*) Dr. Wolfson found Plaintiff had "tension signs on the left, weakness on the left, and sensory changes in the [L5-S1] distribution." (*Id.* at 86) Dr. Wolfson opined Plaintiff's back issues "seem[ed] to be getting worse" and that surgery was needed for his lumbar spine. (*Id.* at 86, 87) Dr. Wolfson concluded Plaintiff could not work, but was not "permanent and stationary" due to the unresolved back issues. (*Id.* at 87)

Dr. Rollins completed a lumbar spine impairment questionnaire on October 8, 2012. (Doc. 18-14 at 105) He noted that he saw Plaintiff on a monthly basis beginning the day after his accident, and last treated him on September 24, 2012. (*Id.*) According to Dr. Rollins, Plaintiff exhibited a tenderness and limited range of motion in both his knees and back, as well as crepitus in the knees. (*Id.* at 105-06) He noted that bending, lifting, and standing increased the pain. (*Id.* at 106) Dr. Rollins opined Plaintiff could sit for four hours in an eight-hour day and stand/walk for four hours in an eight-hour day. (*Id.* at 107) Dr. Rollins indicated Plaintiff should not continuously sit in a work setting and needed to get up and move around on an hourly basis, for 15 minutes each time. (*Id.* at 108) Dr. Rollins believed that Plaintiff could occasionally lift and carry up to 10 pounds but never more than 10 pounds. (*Id.*) Further, Dr. Rollins opined Plaintiff could not do any pushing, kneeling, bending, or stooping. (*Id.* at 110) He concluded that Plaintiff's physical impairments were frequently severe enough to interfere with his attention and concentration, and he was likely to miss work about two to three times a month. (*Id.* at 110-11)

On January 28, 2013, Dr. Alan Coleman reviewed the record and opined Plaintiff could lift and carry 10 pounds frequently and 25 pounds occasionally, stand and/or walk for four hours in an eight-hour day, and sit about six hours in an eight-hour day. (Doc. 18-14 at 28) In addition, Dr. Coleman opined Plaintiff could occasionally climb ramps, stairs, ladders, ropes, and scaffolds; kneel; crouch; and crawl; and frequently balance and stoop. (*Id.* at 29)

**B.     Hearing Testimony**

Plaintiff testified at the administrative hearing before the ALJ on September 20, 2013. (Doc. 18-3 at 45) He reported he had a tenth-grade education but obtained his GED. (*Id.* at 47) Plaintiff said he last worked as a mason tender, carrying materials to masons who were working. (*Id.* at 48) Plaintiff

9

believed he was no longer able to work due to impairments with his lower back, knees, and right foot. (*Id.* at 48-49)

He said that had surgeries on each knee and was anticipating surgery on his back. (Doc. 18-3 at 49) Plaintiff reported he also received physical therapy and injections in his back for the pain, which relieved it "[f]or a short period of time." (*Id.* at 50)

Plaintiff stated that on a typical day, he walked his six-year-old son to school, which was a block away from where they lived and then spent "most of the [day]… laying in bed watching TV." (Doc. 18-3 at 48, 50) He estimated that he could walk "about three to four blocks," stand about thirty minutes at one time, and sit about forty-five minutes at one time. (*Id.* at 51) He believed he could carry "about ten pounds." (*Id.* at 56) He reported that he fell when he tried to lift his son, who weighed about thirty-five pounds at the time, and had to go to the emergency room. (*Id.* at 56-57)

Plaintiff testified that household chores—such as vacuuming, sweeping, and mopping—were "hard… to do." (Doc. 18-3 at 51) He explained that mowing the lawn took him "over an hour," though it should only take twenty minutes, because he had to take "two or three breaks" during the hour, sitting down for about five to ten minutes each break. (*Id.* at 51-52) He did not believe he could "do a job where [he] could sit and stand and alternate positions" due to his pain. (*Id.* at 58)

## C. The ALJ's Findings

Pursuant to the five-step process, the ALJ first determined Plaintiff "did not engage in substantial gainful activity during the period from his alleged onset date of January 18, 2009 though his date last insured of March 31, 2013." (Doc. 18-3 at 29) At step two, the ALJ found Plaintiff's severe impairments included: "degenerative disc disease of the lumbar spine with radiculopathy; internal derangement and degenerative joint disease of the bilateral knees; and obesity." (*Id.*) At step three, the ALJ determined Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled a Listing. (*Id.* at 30) Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to perform work activities with the following limitations: he can lift and carry up to 10 pounds. He can stand and walk for no more than 4 hours in an 8-hour workday. He can sit for no more than 4 hours in an 8-hour workday. He is also limited to no more than occasional bending, stooping, crouching, climbing, kneeling, balancing, crawling, pushing, and pulling.

(*Id.* at 30-31) With these limitations, the ALJ found at step four that Plaintiff was not able to perform

any past relevant work. (*Id.* at 35) However, the ALJ concluded, "considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that existed in significant numbers in the national economy that the claimant could have performed," including cashier, addresser, and order clerk. (*Id.* at 36) Therefore, the ALJ found Plaintiff was not disabled as defined by the Social Security Act. (*Id.* at 37)

## DISCUSSION AND ANALYSIS

Plaintiff contends the ALJ erred in reviewing the medical record, evaluating his credibility, and in relying upon the testimony of the vocational expert. (*See generally* Doc. 20 at 15-37) On the other hand, the Commissioner contends that the ALJ's evaluation of the record "is supported by substantial evidence and free from reversible legal error." (Doc. 21 at 28; *see also id.* at 9-28)

**A.     ALJ's Evaluation of the Medical Evidence**

In this circuit, the courts distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). In general, the opinion of a treating physician is afforded the greatest weight but it is not binding on the ultimate issue of a disability. *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Further, an examining physician's opinion is given more weight than the opinion of non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

A physician's opinion is not binding upon the ALJ and may be discounted whether another physician contradicts the opinion. *Magallanes*, 881 F.2d at 751. An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only by identifying "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence in the record." *Id.*, 81 F.3d at 830. When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's resolution of the conflict must be upheld when there is "more than one rational interpretation of the evidence." *Id.; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir.

1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ").

Plaintiff contends the ALJ erred in rejecting opinions offered by Dr. Rollins, his treating physician, and Dr. Wolfson, an examining physician. (Doc. 20 at 16-22) Defendant argues, "The ALJ correctly assigned some weight to Dr. Rollins' opinion and little weight to Dr. Wolfson's opinion based on their consistency and supportability given the overall record." (Doc. 21 at 10) Because opinions of Drs. Rollins and Wolfson were contradicted by other physicians— including Drs. Van Kirk, Nasrabadi, and Coleman— the ALJ was required to set forth specific and legitimate reasons to support the decision to reject the opinions. *See Lester*, 81 F.3d at 830.

1. Opinion of Dr. Rollins

Examining the medical evidence, the ALJ summarized the conclusions of Dr. Rollins and explained the weight given to the opinions as follows:

> David Rollins, M.D., who has treated the claimant since January 2009, found on October 8, 2012 that the claimant could lift and carry up to 10 pounds, stand and walk for no more than 4 hours in an 8-hour workday, and sit for no more than 4 hours in an 8-hour workday. Dr. Rollins further stated that the claimant would need to change positions frequently, would be absent from work about 2 to 3 times a month, and was limited to no pushing, kneeling, bending, or stooping (Exhibit 18F). Dr. Rollins also consistently stated during the period from January 2009 through March 2010 that the claimant could return to work with a 25-pound weight limit (Exhibit 4F). These opinions allowing the claimant to perform some sedentary to light exertion are given some weight because they are consistent with the adequate functioning that the claimant exhibited during the orthopedic consultative examination conducted on May 23, 2012 (Exhibit 12F). In addition, Dr. Rollins has a substantial treating relationship with the claimant and has a longitudinal perspective of the claimant's impairments, which augments the reliability of the opinion. Meanwhile, the opinion restricting the claimant to no more than sedentary to light exertion is consistent with the positive findings and positive clinical signs concerning the claimant's back and bilateral knees....However, the opinion understates the claimant's ability to remain in one position, maintain regular attendance, and perform postural activities, and is inconsistent with the routine and conservative nature of the treatment for the claimant's back disorder. Moreover, the opinion is inconsistent with the general absence of clinical signs concerning the claimant's bilateral knees in the objective medical evidence after the respective surgeries (Exhibits 6F and 20F). Furthermore, the opinion is inconsistent with the admitted and reported effectiveness of the treatment for the claimant's back and knee disorders (Exhibits 5E, 1F/10, 2F/23, and hearing testimony). Finally, the opinion is inconsistent with the claimant's admitted ability to be independent in self-care, carry out light household chores, help take care of a young child, and drive a car (Exhibits 5E, 12F, 16F, and hearing testimony).

(Doc. 18-3 at 33-34) Plaintiff contends the ALJ's reasons for rejecting the postural limitations and the need for an option to sit and stand are not specific and legitimate reasons supported by the record.

(Doc. 20 at 16-20)

        a.       Treatment received

Previously, this Court has determined, "A conservative course of treatment relative to a finding of total disability is a proper basis for discounting the extreme restrictions reported by a treating physician." *Nicola v. Astrue*, 2010 U.S. Dist. LEXIS 42099, at *22 (E.D. Cal. April 29, 2010) (citing *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (ALJ may reject opinion of treating physician who prescribed conservative treatment yet opined that claimant was disabled). However, as Plaintiff observes, he received epidural block injections and back surgery was recommended by several physicians.[2] (Doc. 20 at 17-18)

Notably, prescription narcotics and epidural injections for pain are not conservative treatment. *Tunstell v. Astrue*, 2012 WL 3765139, at *4 (C.D. Cal. 2012) (rejecting the ALJ's finding that plaintiff received only conservative treatment because "she had used narcotic pain medication…"); *Oldham v. Astrue*, 2010 WL 2850770, at *9 (C.D. Cal. 2010) (noting that epidural steroid injections are "performed in operation-like settings" and not a form of conservative treatment). Indeed, the Ninth Circuit has criticized an ALJ for characterizing treatment as conservative where the claimant's treatment included "copious amounts of narcotic pain medication as well as occipital nerve blocks and trigger point injections," and cervical fusion surgery. *Lapeirre-Gutt v. Astrue*, 382 Fed. App'x. 662, 664 (9th Cir. 2010) (comparing the facts presented to those in *Carmickle v. Comm'r*, 533 F.3d 1155, 1162 (9th Cir. 2008), where the ALJ found claimant's treatment to be conservative where claimant took only Ibuprofen to treat his pain)).

Similarly, Plaintiff was treated with narcotic medication and epidural block injections. Therefore, Plaintiff's treatment was not entirely conservative in nature. *See Parra*, 481 F.3d at 751 (9th Cir. 2007) (finding that over-the-counter drugs constituted conservative treatment); *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (conservative treatment included physical therapy and the use of anti-

---

[2] Plaintiff has submitted additional evidence that he did, in fact, have surgery after the ALJ issued his opinion. (Doc. 20-1) As the Central District stated, "surgery and conservative measures are at different ends of the treatment spectrum." *Sanchez v. Colvin*, 2013 U.S. Dist. LEXIS 47081, at *10 (C.D. Cal. Mar. 29, 2013). While the surgery was performed after the ALJ issued his opinion in the action, it is clear, the physicians believed even during the relevant time period that surgery was necessary and was pursuing additional treatment. (*See* Doc. 18-14 at 86, 87; Doc. 18-16 at 737-38, 885)

13

inflammatory medication); *Tagle v. Astrue*, 2012 WL 4364242 at *4 (C.D. Cal. Sept. 21, 2012) ("While physical therapy and pain medication are conservative, epidural and trigger point injections are not"). Accordingly, the treatment Plaintiff received is not a specific, legitimate reason for rejecting Dr. Rollins's opinions regarding Plaintiff's need for a sit/stand opinion and inability to push, kneel, bend, or stoop. (*See* Doc. 18-14 at 108, 110)

        b.      *Inconsistencies with the medical record*

The ALJ rejected the opinions of Dr. Rollins, in part, as inconsistent with the medical record. Specifically, the ALJ found the opinions that Plaintiff was unable to "remain in one position, maintain regular attendance, and perform postural activities [was]… inconsistent with the general absence of clinical signs concerning the claimant's bilateral knees in the objective medical evidence after the respective surgeries (Exhibits 6F and 20F)." (Doc. 18-3 at 34)

Significantly, to support the conclusion that the opinions of Dr. Rollins are inconsistent with the medical record, the ALJ cites broadly to two exhibits totaling more than 120 pages. When an ALJ believes the treating physician's opinion is unsupported by the objective medical evidence, the ALJ has a burden to "set[] out *a detailed and thorough summary of the facts and conflicting clinical evidence*, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986) (emphasis added). The ALJ failed meet this burden because he did not identify the clinical findings he believed to be in conflict with the limitations identified by Dr. Rollins. Rather, the ALJ has offered only his conclusions that the medical evidence contradicted the opinions. Therefore, the purported conflict with the medical record is not a specific, legitimate reason for rejecting Dr. Rollins' opinions regarding Plaintiff's physical limitations.

        c.      *Effectiveness of treatment*

The ALJ also rejected the limitations identified by Dr. Rollins as "inconsistent with the admitted and reported effectiveness of the treatment for the claimant's back and knee disorders (Exhibits 5E [Doc. 18-7 at 51-53], 1F/10 [Doc. 18-8 at 11], 2F/23 [Doc. 18-8 at 44], and hearing testimony)." (Doc. 18-3 at 34)

In the documents cited by the ALJ, Dr. Watson noted on the day of surgery that Plaintiff had "been treated with antiinflammatory (sic) medications, a cold pack, muscle relaxants and physical

therapy," which "provided some improvement" to the right knee. (Doc. 18-8 at 44) Following the surgery on his right knee, Plaintiff told Dr. Martinez that surgery "helped him to a moderate degree." (Doc. 18-8 at 11) In the pain questionnaire Plaintiff completed, he reported exercises his physical therapist taught him relieved the pain "a little." (Doc. 18-7 at 53) Thus, the documents cited by the ALJ do not indicate the treatment received was, in fact, effective.

To the contrary, the record reflects many statements by physicians that the treatment provided was not effective, particularly related to Plaintiff's back injury. For example, in December 2009, Dr. Fluence noted Plaintiff had "been treated with oral medication, physical therapy, etc[.] with very poor results." (Doc. 18-8 at 37) In February 2010, Dr. Martinez noted that Plaintiff's two epidural blocks "failed to give him significant relief." (Doc. 18-8 at 11) In September 2012, Dr. Wolfson opined Plaintiff's back issues "seem[ed] to be getting worse" and that surgery was needed for his lumbar spine. (Doc. 18-14 at 86, 87) Likewise, surgery was recommended by Drs. Bybee and Rollins. (Doc. 18-16 at 737-38, 885) Consequently, the record does not support the ALJ's conclusion that Plaintiff's treatment was effective, and this is not a specific and legitimate reason for rejecting the limitations imposed by Dr. Rollins.

### d. *Level of activity*

The Ninth Circuit has determined an ALJ may reject an opinion when the physician sets forth restrictions that "appear to be inconsistent with the level of activity that [the claimant] engaged in." *Rollins*, 261 F.3d 853, 856 (9th Cir. 2001); *see also Fisher v. Astrue*, 429 Fed. App'x 649, 652 (9th Cir. 2011) (concluding the ALJ set forth specific and legitimate reasons for rejecting a physician's opinion where the assessment was based upon the claimant's subjective complaints, and limitations identified by the doctor conflicted with the claimant's daily activities).

The ALJ observed that Plaintiff is able "to be independent in self-care, carry out light household chores, help take care of a young child, and drive a car." (Doc. 18-3 at 34) However, the ALJ fails to explain how these limited activities conflict with the restrictions identified by Dr. Rollins. Indeed, Plaintiff testified that doing yard work should be a twenty-minute task but takes him an hour—during which he needs breaks to rest—and he walks only two blocks when taking his son to school and returning home. (Doc. 18-3 at 48, 51-52) Further, the ability to drive a car does not conflict with the

Dr. Rollins' conclusion that Plaintiff could sit, though he was unable to do so for an extended period. Given the ALJ's failure to explain how Plaintiff's level of activity conflicts with the limitations identified by Dr. Rollins, this factor does not support the decision to give less weight to the opinion.

### *e.* *Conclusion*

The ALJ failed to identify specific and legitimate reasons for rejecting the limitations imposed by Dr. Rollins regarding Plaintiff's "ability to remain in one position, maintain regular attendance, and perform postural activities." Consequently, the Court cannot find the ALJ's evaluation of the medical record was proper.

### 2. Opinion of Dr. Wolfson

The ALJ rejected the opinion of Dr. Wolfson, in large part, on the same grounds and the same evidence as the opinion of Dr. Rollins. (*See* Doc. 18-3 at 34) However, the opinion from Dr. Wolfson that the ALJ rejected was the conclusion "that the claimant could not work." (*See id.*)

Importantly, as the ALJ notes, the determination of whether a claimant is disabled is reserved for the Commissioner, and statements "by a medical source that [a claimant] is 'disabled' or 'unable to work'" "are not medical opinions." 20 C.F.R. §§ 404.1527(e), 416.927(e). Previously, this Court explained, "[A]n ALJ is not obligated to provide detailed reasons for rejecting a medical expert's opinion regarding the ultimate question of disability." *James v. Astrue*, 2012 U.S. Dist. LEXIS 139929, at * 25 (E.D. Cal. Sept. 27, 2012) (citing *Nyman v. Heckler*, 779 F.2d 528, 531 (9th Cir. 1985)). Dr. Wolfson's belief that Plaintiff "could not work" is clearly a statement "that would direct the determination or decision of disability." *See* 20 C.F.R. §§ 404.1527(e), 416.927(e). Accordingly, the ALJ was entitled to reject the conclusion of Dr. Wolfson as an issue reserved for the Commissioner.

## B. Remand is Appropriate

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

Here, the ALJ failed to identify legally sufficient reasons for rejecting the limitations assessed by Plaintiff's treating physician, Dr. Rollins. Therefore, the matter should be remanded for the ALJ to re-evaluate the medical evidence to determine Plaintiff's physical residual functional capacity. *See Moisa*, 367 F.3d at 886.

## **CONCLUSION AND ORDER**

For the reasons set forth above, the Court finds the ALJ erred in evaluating the medical evidence, and the administrative decision should not be upheld by the Court. *See Sanchez*, 812 F.2d at 510. Because remand is appropriate based upon the review of the medical evidence, the Court declines to address the remaining issues raised by Plaintiff in his opening brief. Based upon the foregoing, the Court **ORDERS**:

1. Plaintiff's motion for summary judgment is **GRANTED**;
2. The matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision; and
3. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Plaintiff Darren Greer and against Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated: **August 17, 2017**       **/s/ Jennifer L. Thurston**
UNITED STATES MAGISTRATE JUDGE